Filed 8/28/24  P. v. Gil CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D082263 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. RIF1403687) |
| EFRAIN MANZO GIL, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Riverside, Candace J. Beason (Retired Judge of the Los Angeles Sup. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.) and Sean Crandell, Judges.  Affirmed as modified.

Cynthia M. Jones, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, A. Natasha Cortina and Kelley Johnson, Deputy Attorneys General for Plaintiff and Respondent.

# I

# INTRODUCTION

A jury found defendant Efrain Manzo Gil guilty of committing lewd acts on his four-year-old and five-year-old sons after he touched them on the buttocks over their clothes and put his tongue inside their mouths while he kissed them. In a bifurcated sanity trial, the same jury found Manzo Gil was sane when he committed these lewd acts on his sons.

Manzo Gil appeals his judgment of conviction. He claims: (1) the trial court erred by denying a motion to suppress statements he made during a custodial interrogation because his schizophrenia prevented him from knowingly and intelligently waiving his rights under *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*), and his statements were involuntary; (2) the court erred by precluding his expert witness from testifying that his schizophrenia may have caused him to be confused during the interrogation; (3) the court erred when instructing the jury on the defense of not-guilty-by-reason-of-insanity (NGI); (4) his prison sentence of 30 years to life violated the state and federal constitutional bans on cruel and unusual punishment; (5) the court erred by failing to ensure he was sentenced by his trial judge or an adequately prepared alternative judge; and (6) the court failed to award him all of the custody and conduct credits to which he is entitled.

We agree with Manzo Gil's argument concerning credits and amend the judgment to award him a total of 2,872 actual custody credits and 430 conduct credits. We reject his remaining arguments and affirm the judgment as modified.

II

BACKGROUND

In September 2014, the Riverside County district attorney filed a felony complaint against Manzo Gil alleging he committed lewd acts against his three minor sons. The trial court declared a doubt about Manzo Gil's competence and found him incompetent to stand trial. It later declared his competence restored.

In May 2017, the district attorney filed a first amended information. The information charged Manzo Gil with sexual penetration of his youngest son, John Doe 1, a person 10 years of age or younger (Pen. Code,[1] § 288.7; count 1); and committing lewd acts on his three sons, John Does 1–3, all of whom were under the age of 14 years (§ 288, subd. (a); count 2–4). It also alleged he perpetrated the lewd acts against multiple victims. (§ 667.61, subd. (e)(4).) Manzo Gil pleaded not guilty and NGI to all charges. Because he entered a plea of NGI, the case proceeded to a bifurcated trial on the issues of guilt and sanity.

A. *Guilt Phase*

   1. *Child Protective Services Report*

Manzo Gil and Kelly L. married in 2004. They had three sons together—John Does 1, 2, and 3.

A few years after Manzo Gil and Kelly L. got married, Manzo Gil started using crystal methamphetamine regularly. He also began displaying signs of mental illness in or about 2008, while he was in custody for an unrelated offense. According to Kelly L., Manzo Gil claimed he could "hear voices," spoke in a delayed manner, and isolated himself from his friends. Other family members observed him discussing "extraterrestrial beings,"

---

[1]     Further undesignated statutory references are to the Penal Code.

3

speaking to himself, and claiming he could hear the voice of someone named "Albert."

Manzo Gil and Kelly L. separated in 2009. After the separation, the children lived primarily with Kelly L. and they visited Manzo Gil at his parents' home every other weekend.

In 2014, Kelly L. reported to Child Protective Services that John Doe 2 had tried to put his tongue inside her mouth while kissing her. John Doe 2 told her that Manzo Gil had stuck his tongue inside John Doe 2's mouth when they kissed. John Doe 2 also disclosed that Manzo Gil had touched him on the buttocks over his clothing and tickled his anus.

2. *Riverside County Assessment Team Interviews*

A member of the Riverside County Assessment Team (RCAT) interviewed all three boys at a medical center in September 2014. Video footage of the RCAT interviews was played for the jury.

John Doe 1 was five years old when he was interviewed by the RCAT member. He told the interviewer Manzo Gil did "nasty stuff" and "put out his tongue" when they kissed. John Doe 1 "said no," but Manzo Gil "still wanted to do it" and told John Doe 1, "Let me do my nasty stuff." According to John Doe 1, Manzo Gil kissed him this way ten times and he also did it to John Does 2 and 3. John Doe 1 said Manzo Gil did other "nasty stuff," like giving him a "butt massage ... to diarrhea." John Doe 1's clothes were on during the "butt massage." However, according to John Doe 1, the "butt massage" was in the spot where you "go poop," and it "[h]urt a lot." John Doe 1 said he disclosed these acts to his grandmother, but Manzo Gil "ke[pt] on doing [the] butt massage."

John Doe 2 was six years old when he was interviewed. He told the interviewer Manzo Gil acted "nasty." According to John Doe 2, Manzo Gil put

4

his tongue inside John Doe 2's mouth and "rolled it around" when they kissed, which felt "mean" to him. Manzo Gil "just did that once," and John Doe 2's grandfather told Manzo Gil "to stop or he'[d] call the cops on him."

John Doe 3 was nine years old at the time of his RCAT interview. He said Manzo Gil kissed John Doe 2 on the lips, but John Doe 3 denied that Manzo Gil kissed either himself or John Doe 1 in the same way. According to John Doe 3, John Doe 2 said Manzo Gil touched him "somewhere," but would not say where he touched him.

    3. *Custodial Interrogation*

Riverside County sheriff's investigator Chris Barajas interrogated Manzo Gil at the sheriff's station after the RCAT interviews. An audio recording of the interrogation was played for the jury.

After a few minutes of small talk, Barajas asked Manzo Gil about his marriage. Manzo Gil said he left Kelly L. after he had served five years in prison. He said he "thought [he] was gonna do good" upon his release from prison, but he "fell back into drugs." Manzo Gil also stated he saw "things" because someone had "cursed" him and used "witchcraft" on him.

Barajas then asked Manzo Gil whether he was medicated and under a doctor's care. Manzo Gil said he was not under a doctor's care and he used to take medications for anxiety and sleep issues, but they made him feel sick and he was not taking them anymore. Barajas asked whether Manzo Gil took "psychological drugs," and he replied, "No." Thereafter, Barajas provided Manzo Gil with *Miranda* admonitions, and asked, "Got that?" Manzo Gil replied, "Mm-hm."

After Barajas provided *Miranda* admonitions, he asked Manzo Gil whether he knew why they were interviewing him. Manzo Gil said his "little boy" told his classmates he had kissed him "on the mouth" and stuck his

5

tongue inside his mouth. Manzo Gil explained that he played with his sons in a "cute" and "normal" way by "touch[ing] his lip but not in a gross way." According to Manzo Gil, his son had asked him to give him a kiss and his son jokingly said, "Mmm" when Manzo Gil kissed him. Manzo Gil said he told his son, "[D]on't do that. That's gross."

Unprompted, Manzo Gil then stated he wanted to talk to Barajas about "Albert." Manzo Gil said he met "Albert" in prison, "Albert" spoke to him "in [his] mind," and "Albert" stated "there's a virus that goes around ...." Manzo Gil said "Albert" spoke to his boys as well. Manzo Gil described "Albert" as "our creator." He said "Albert" has a human body and can transform himself into anything he wants. Manzo Gil said he believed there was "a way that [he could] get back with [Kelly L.] and be out there and try to work," but "Albert" did not let him. He added, "everything that's going on ain't normal."

Barajas redirected the conversation to Manzo Gil's sons and asked how long Manzo Gil had played the "kissing game" with them. Manzo Gil denied playing a "kissing game" or kissing his boys on the lips with his tongue out. However, he said "Albert" talked to his boys and they played around and teased him by asking him to kiss them. In response, Barajas asked Manzo Gil whether "Albert" told the boys to kiss him with their tongues and Manzo Gil said he did not know, but he thought so. Later in the interrogation, Manzo Gil admitted "Albert" had influenced him to kiss John Does 1 and 2 on the mouth with his tongue out "once or twice." Then, he admitted he kissed his sons that way two or three times.

Barajas asked Manzo Gil several questions about whether "Albert" had influenced him to give "butt massages" to his sons or otherwise touch them improperly. At points, Barajas stated, "Albert tells you what to do," "Albert has influenced you to touch your boys," or something similarly definitive in

6

nature. In response, Manzo Gil said "Albert" had tried to influence him, but he denied touching his sons or giving them "butt massages." He also denied engaging in oral copulation with his sons. But, under further questioning, Manzo Gil admitted that—at "Albert's" urging—he had used his finger to poke his sons' anuses over their clothing. He said he did this to John Doe 1 once, to John Doe 2 three times, and to John Doe 3 five times.

4. *Victim Testimony*

John Does 1, 2, and 3 testified at trial when they were seven, nine, and twelve years old, respectively.

John Doe 1 testified that Manzo Gil never touched him in a way that made him feel bad. However, he refused to answer any questions about whether Manzo Gil kissed him in a way that made him feel uncomfortable. He also said he was "holding something back" during his testimony because he did not want his father to "stay in jail."

John Does 2 and 3 both denied that Manzo Gil touched or kissed them inappropriately. They also denied seeing him touch or kiss their brothers inappropriately.

5. *Testimony of Manzo Gil*

Manzo Gil took the witness stand and told the following version of events to the jury.

Manzo Gil started using methamphetamine regularly in or about 2006. He first experienced symptoms of mental illness after his brother-in-law performed "witchcraft" on him. Manzo Gil heard indecipherable voices in his head, which sounded like "background talking." He also got "more addicted" to drugs. A few times, he saw Kelly L.'s name flashing like a "flare" of light.

Manzo Gil stopped using drugs briefly in 2009, but he relapsed, stopped working, and started stealing. When he relapsed, he felt a "bad spirit fly and

go into [his] head," which told him, "Just go smoke if you need it."  He also saw a "shadow on top of the garage" that looked like "the devil."

Manzo Gil met "Albert" in 2009, a few months after he was incarcerated for an unrelated offense.  "Albert" spoke to Manzo Gil "in [his] mind" and told him, "I'm your creator.  I'm everybody's creator.  I'm the one that gives you life."  He told Manzo Gil about wives and children he would have in the future and showed him visions of them.  Manzo Gil continued to hear "Albert's" voice on a daily basis after his release from custody.  In 2014, Manzo Gil received psychiatric treatment at a mental health hospital in Mexico.  He felt better, but stopped taking his medications because they made him dizzy and he "wanted to do dope again."

Manzo Gil testified about the manner in which he kissed his boys after his return from Mexico.  When Kelly L. dropped the boys off to spend time with him, he greeted them with "normal" pecks on their lips or cheeks.  One time, while he was playing with his boys, they asked him to stick out his tongue and he did.  John Doe 1 then stuck out his tongue and "almost touched [Manzo Gil's] lip," but Manzo Gil told John Doe 1 to stop and threatened to spank him.  Manzo Gil denied putting his tongue in any of the boys' mouths.  He also denied kissing the boys for the sexual gratification of himself or the boys.

During trial, Manzo Gil listened to the audio recording of his interview with Barajas.  He stated Barajas "never had a recorder" at the interrogation and "Albert" fabricated the audio recording.  Manzo Gil said he did "nothing" to the boys and denied that he had ever admitted putting his tongue in his sons' mouths.  However, he claimed "Albert" tried to get him to confess that "Albert" wanted him do "things" to the boys.  He testified that "Albert" also influenced the boys to lie and make false accusations against him.

8

Manzo Gil testified about the allegations of inappropriate touching as well.  He admitted "Albert" told him to "play perverted" with his boys and "do stuff" to them.  But he denied touching his boys on their buttocks or giving them "butt massages."  He also denied grabbing their penises or touching them to sexually gratify himself or the boys.  Manzo Gil repeated his claim that "Albert" fabricated the audio recording of his admissions concerning inappropriate touching.

6. *Testimony Concerning Manzo Gil's Mental Health*

The defense retained Dr. Michael Kania, a clinical forensic psychologist, to evaluate Manzo Gil and render an opinion on the legitimacy of his *Miranda* waiver and the voluntariness of his admissions during the custodial interrogation.  Dr. Kania's opinions regarding those topics were introduced at trial, outside the presence of the jury, and will be discussed *post*, in section III(A)(1).

Dr. Kania also testified during the guilt phase of trial about Manzo Gil's mental health.  Dr. Kania interviewed Manzo Gil for five hours in September 2016 and for two and a half hours in January 2017.  Dr. Kania also reviewed the transcript from Manzo Gil's interrogation and his prior mental health evaluations, jail medical records, and police reports.

Based on these interviews and documents, Dr. Kania diagnosed Manzo Gil with schizophrenia.  According to Dr. Kania, Manzo Gil exhibited three primary symptoms of schizophrenia—delusions, hallucinations, and disorganized speech.  Dr. Kania testified that people with schizophrenia can sometimes be reliable historians of their own lives, but it may be difficult for them to provide relevant or rational information about themselves if they are unmedicated or going through difficult times.  He stated that, within the context of therapy, it is unadvisable to endorse the auditory hallucinations of

9

a person with schizophrenia because the purpose of therapy is to "bring the person back so they can clearly see reality."

### 7. *Guilt Phase Verdict*

After deliberations, the jury found Manzo Gil guilty of committing lewd acts against his two younger sons, John Does 1 and 2 (counts 2 and 3), and returned a true finding on the multiple-victim allegation. However, it found Manzo Gil not guilty of committing a lewd act against John Doe 3 (count 4). The jury failed to reach a unanimous verdict on the sexual penetration charge (count 1), and a mistrial was declared as to that charge.

### B. *Sanity Phase*

Because Manzo Gil entered a plea of NGI, the case proceeded to a sanity trial to determine whether he was sane when he committed the lewd acts on John Does 1 and 2. At the sanity trial, the defense elicited testimony from Dr. Renee Wilkinson and Dr. Joy Smith-Clark. The prosecution procured testimony from Dr. David Walsh.

### 1. *Dr. Wilkinson*

In the fall of 2014, the trial court appointed Dr. Wilkinson, a clinical psychologist, to evaluate Manzo Gil's mental health under Evidence Code section 1017. When Dr. Wilkinson interviewed Manzo Gil and tried to collect background information from him, Manzo Gil told her he had met "Albert" in jail and "Albert" said he was "the creator" and could "show [Manzo Gil] the future." Manzo Gil brought up "Albert" throughout the interview, even while other topics were being discussed. He told Dr. Wilkinson "Albert" had "molested and raped" him, but had not "made [him] do anything." Manzo Gil made numerous other nonsensical statements during the interview.

Dr. Wilkinson testified that Manzo Gil suffered from entrenched delusions, hallucinations, and disorganized thought processes. She diagnosed

10

him with schizophrenia and methamphetamine abuse disorder. She did not assess whether he suffered from methamphetamine-induced psychosis, but she stated that several of his symptoms were consistent with methamphetamine-induced psychosis.[2] Based on Manzo Gil's delusions, his distorted perception of reality, and the fact he was not properly medicated, Dr. Wilkinson did not believe Manzo Gil was capable of knowing the nature of his lewd acts or distinguishing right from wrong when he perpetrated the acts.

### 2. *Dr. Smith-Clark*

In the summer of 2016, the court appointed Dr. Smith-Clark, a clinical and forensic psychologist, to perform a sanity evaluation of Manzo Gil. During her interview with Manzo Gil, he exhibited detachment, a flat affect, delusions, and difficulties with simplistic thinking. He claimed "Albert" could telepathically communicate with him and tell him what to do. When asked about the pending criminal charges, Manzo Gil first said he did not understand the charges, but later stated he was alleged to have put his finger in his son's buttocks. He believed "Albert had done it," not him.

Dr. Smith-Clark concluded Manzo Gil had an unspecified psychotic disorder and his symptoms were consistent with a schizophrenia diagnosis. She determined—and at trial continued to believe—that he did not understand the nature of his acts because, although he understood the acts were wrong, he believed "Albert" was performing them.

---

[2] According to Dr. Wilkinson, Manzo Gil informed her he started using methamphetamine when he was 16 years old and he used it daily when he was 19 years old. However, he did not disclose information to her about whether he had used methamphetamine more recently. Thus, she assumed "he wasn't using methamphetamine much after 19," but admitted she did not have enough information to determine whether he suffered from a methamphetamine-induced psychosis.

On cross-examination, Dr. Smith-Clark stated that methamphetamine abuse can permanently damage a drug user's brain and produce a psychotic disorder that does not disappear, even after the drug usage stops. The prosecutor presented Dr. Smith-Clark with a hypothetical mirroring the facts of the case—specifically, she was asked to assume a methamphetamine user becomes incarcerated, loses consistent access to methamphetamine, and experiences visual hallucinations while in custody. Dr. Smith-Clark testified this hypothetical fit a diagnosis for substance-induced psychotic disorder. Further, she testified that visual hallucinations are more common with drug usage than naturally occurring schizophrenia.

Dr. Smith-Clark agreed that when a doctor refers to schizophrenia, they are not ruling out the possibility the patient suffers from substance-induced psychosis because "substance-induced psychosis talks about the genesis as in how it started, why he had it, versus schizophrenia [which] describes the current state ...." She said schizophrenia commonly emerges when a person is in their 20's and there is no way to know the origin of one's psychotic symptoms. However, she said heavy methamphetamine use could have been one of the causes of Manzo Gil's psychotic disorder.

3. *Dr. Walsh*

The court appointed Dr. Walsh, a clinical and forensic psychologist, to evaluate Manzo Gil's sanity in the fall of 2016. Manzo Gil reported to Dr. Walsh that he began using methamphetamine when he was 16 years old, his usage increased over time, and he used it daily from the ages of 21 through 26. After interviewing Manzo Gil and reviewing his medical and police records, Dr. Walsh diagnosed him with schizophrenia in remission due to medication, as well as alcohol, marijuana, and methamphetamine use disorders. According to Dr. Walsh, schizophrenia is a genetically inherited

12

disease that can express itself when a person becomes an adult or sometimes when a person uses drugs like methamphetamine. He testified that the symptoms of schizophrenia wax and wane over time.

Dr. Walsh determined that Manzo Gil understood the difference between right and wrong, given that he was able to attribute only his wrongful alleged conduct to "Albert" and his innocuous behavior to himself. However, he did not reach a conclusion about whether Manzo Gil understood the nature and quality of his acts. Instead, he proffered three alternative hypothesis that, at the time of the crimes, Manzo Gil either suffered from a severe mental disorder, he suffered from substance-induced psychosis, or his substance abuse made his schizophrenia worse. Dr. Walsh said he could not reliably conclude which hypothesis was correct due to his late involvement in the case and the victims' unreliable memories.

The prosecution presented Dr. Walsh with the same hypothetical scenario it gave Dr. Smith-Clark—i.e., a heavy methamphetamine user becomes incarcerated, loses his access to drugs, and experiences visual and auditory hallucinations—and asked him whether he had an opinion about the cause of the hallucinations and psychosis in the hypothetical. Dr. Walsh testified that visual hallucinations are typically associated with intoxication withdrawal and the auditory hallucinations discussed in the hypothetical could be caused either by drug use or a disease process.

### 4. *Sanity Phase Verdict*

At the conclusion of the sanity trial, the jury found Manzo Gil was sane when he perpetrated counts 2 and 3.

### C. *Further Proceedings*

In November 2018, after the jury returned its verdicts, but before sentencing, a new doubt was declared about Manzo Gil's competence and the

13

court again suspended the criminal proceedings. In June 2021, after numerous continuances and a bench trial on the issue of competence, the court declared Manzo Gil incompetent. A year later, the court found Manzo Gil's competence was restored and it reinstated proceedings.

In July 2022, the court sentenced Manzo Gil to prison for an indeterminate term of 30 years to life, consisting of consecutive 15-years-to-life terms for each of his two lewd act convictions.

Manzo Gil filed a timely notice of appeal from the judgment of conviction.

## III

## DISCUSSION

### A. *The Trial Court Properly Admitted Manzo Gil's Admissions*

Manzo Gil's primary argument on appeal is that the trial court erred by admitting into evidence the admissions he made to investigator Barajas during the custodial interrogation that took place in September 2014. He claims the court should have excluded his admissions because he did not knowingly and intelligently waive his *Miranda* rights. Alternatively, he contends his statements were involuntary because they were the product of law enforcement coercion. We are not persuaded by either of these arguments.

#### 1. *Additional Background*

Before trial, the parties filed competing motions regarding the admissibility of Manzo Gil's admissions to Barajas. In its motion in limine, the prosecution argued the statements were admissible because Barajas gave proper *Miranda* warnings before inquiring about the suspected crimes, Manzo Gil seemingly understood and responded to Barajas's questions, and Manzo Gil's mental condition did not preclude a valid *Miranda* waiver. By

14

contrast, in his motion to suppress, Manzo Gil argued the statements were inadmissible because he lacked the capacity to waive his *Miranda* rights due to his impaired mental condition. He also argued Barajas coerced the statements from him by exploiting and endorsing his delusions.

The court held a hearing under Evidence Code section 402 to determine the admissibility of Manzo Gil's admissions. Defense expert Dr. Kania testified at the hearing. When Dr. Kania interviewed Manzo Gil in January 2017, about two and a half years after the custodial interrogation, Dr. Kania questioned Manzo Gil about his understanding of his *Miranda* rights. When asked to describe the meaning of the right to remain silent, Manzo Gil replied, "I could remain silent. I didn't have to answer any of his questions." When asked what it meant for information to be used against him, Manzo Gil said information could be used "against" him in court. Dr. Kania also asked for his understanding of the right to have an attorney present, and he said he had "a right to have an attorney represent [him] in court." When pressed, Manzo Gil said he was not sure whether he had a right to have an attorney present *outside* of court.

Based on this interview, as well as Dr. Kania's review of the interrogation transcript and other documents, Dr. Kania opined that Manzo Gil did not understand and knowingly waive his *Miranda* rights. He acknowledged Manzo Gil was responsive to Barajas's questions prior to the *Miranda* admonitions, including questions about his work history, health, education, family, and prior criminal cases. Nonetheless, he opined that Manzo Gil's disorganized thought processes and delusions "made it so that he couldn't make rational or reality-based decisions" related to his *Miranda* waiver. Although Manzo Gil received *Miranda* admonitions during his prior arrests, and previously invoked his *Miranda* rights, Dr. Kania believed he did

15

not understand his right to remain silent because he apparently invoked his *Miranda* rights in the past to avoid being seen by others as a snitch—not because he wished to avoid making statements that could be used against him in court. Dr. Kania also emphasized that, at the time of their January 2017 interview, Manzo Gil did not know whether he could have an attorney present outside of court.

At the conclusion of the hearing, the court declined to adopt Dr. Kania's position, granted the prosecution's motion in limine, and denied Manzo Gil's motion to suppress. The court opined that although Manzo Gil exhibited "pockets of delusional thinking" during the interrogation, his statements were "voluntary" and "allowable" because he received proper *Miranda* admonitions and there was "no coercion."

### 2. *Miranda Principles*

The Fifth Amendment to the federal constitution provides that "[n]o person ... shall be compelled in any criminal case to be a witness against himself." (U.S. Const., 5th Amend.) " ' " 'As a prophylactic safeguard to protect a suspect's Fifth Amendment privilege against self-incrimination, the United States Supreme Court, in *Miranda*, required law enforcement agencies to advise a suspect, before any custodial law enforcement questioning, that "[1] he has the right to remain silent, [2] that anything he says can be used against him in a court of law, [3] that he has the right to the presence of an attorney, and [4] that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." ' " ' " (*People v. Suarez* (2020) 10 Cal.5th 116, 157 (*Suarez*).)

" '*Miranda* holds that "[t]he defendant may waive effectuation" of the rights conveyed in the warnings "provided the waiver is made voluntarily, knowingly and intelligently." [Citation.] The inquiry has two distinct

16

dimensions. [Citations.] First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the "totality of the circumstances surrounding the interrogation" reveals both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.' " (*People v. Smith* (2007) 40 Cal.4th 483, 501–502 (*Smith*).) "A statement obtained in violation of a suspect's *Miranda* rights may not be admitted to establish guilt in a criminal case." (*People v. Jackson* (2016) 1 Cal.5th 269, 339.)

The prosecution bears the burden of proving, by a preponderance of the evidence, that a defendant's *Miranda* waiver was knowing, intelligent, and voluntary. (*People v. Nelson* (2012) 53 Cal.4th 367, 374–375 (*Nelson*).) On appeal, we independently review the trial court's legal determination of whether a *Miranda* waiver was knowing, intelligent, and voluntary. (*Suarez, supra*, 10 Cal.5th at p. 158; see *People v. Sumagang* (2021) 69 Cal.App.5th 712, 725 ["We review independently the trial court's legal determinations of whether a *Miranda* waiver was knowing, intelligent, and voluntary."].) " 'We evaluate the trial court's factual findings regarding the circumstances surrounding the defendant's statements and waivers, and " 'accept the trial court's resolution of disputed facts and inferences, and its evaluations of credibility, if supported by substantial evidence.' " ' [Citation.] When 'an interview is recorded, the facts surrounding the admission or confession are undisputed and we may apply independent review.' " (*Suarez*, at p. 158.)

### 3. *The Miranda Waiver was Knowing and Intelligent*

Applying our de novo review, we agree with the trial court's conclusion that Manzo Gil knowingly and intelligently waived his *Miranda* rights.

"In assessing whether the waiver was knowing and intelligent, relevant circumstances include ' "(i) the defendant's mental capacity; (ii) whether the defendant signed a written waiver; (iii) whether the defendant was advised in his native tongue or had a translator; (iv) whether the defendant appeared to understand his rights; (v) whether the defendant's rights were individually and repeatedly explained to him; and (vi) whether the defendant had prior experience with the criminal justice system." ' " (*Suarez, supra*, 10 Cal.5th at p. 161; see also *People v. Miranda-Guerrero* (2022) 14 Cal.5th 1, 16 (*Miranda-Guerrero*) [" 'The totality approach permits—indeed, it mandates — inquiry into all the circumstances surrounding the interrogation,' including the defendant's 'age, experience, education, background, and intelligence,' and 'whether he has the capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights.' "].) In this case, the totality of the circumstances confirm that Manzo Gil was aware of his *Miranda* rights and knowingly and intelligently relinquished them.

As a preliminary matter, Barajas properly admonished Manzo Gil about his *Miranda* rights. Before questioning Manzo Gil about the details of the crimes for which he was arrested, he instructed Manzo Gil, "[Y]ou have the right to[] remain silent. Anything you say can and will be used against you in a court of law. You have the right to talk to a lawyer and have one present with you while we talk. If you cannot afford to hire a lawyer one will be appointed to represent you before any questions." "*Miranda* admonitions require no 'talismanic incantation,' but they must contain each of the

mandatory warnings, either as the high court set them out in *Miranda* itself or by some ' "*fully effective equivalent.*" ' " (*Miranda-Guerrero, supra*, 14 Cal.5th at p. 17.)  Barajas's admonitions clearly satisfied this threshold.

After providing *Miranda* admonitions, Barajas asked Manzo Gil if he "[g]ot that," thus seeking confirmation that he understood the explanation of his *Miranda* rights.  Manzo Gil replied, "Mm-hm."  Manzo Gil's affirmative response was an objective acknowledgement he understood his *Miranda* rights as they were explained to him.  (See *Miranda-Guerrero, supra*, 14 Cal.5th at p. 18 [defendant understood *Miranda* rights when he was asked if he understood them and he replied "Mm hm"]; *People v. Leon* (2020) 8 Cal.5th 831, 844 [defendant affirmed understanding of *Miranda* rights by nodding and saying "mmhmm" when asked if he understood them].)  Further, "[a]lthough [Manzo Gil] 'did not expressly waive his *Miranda* rights, he did so implicitly by willingly answering questions after acknowledging that he understood those rights.' " (*Nelson, supra*, 53 Cal.4th at p. 375; see *People v. Krebs* (2019) 8 Cal.5th 265, 302 ["A valid waiver need not be express, but 'may be implied from the defendant's words and actions.' "].)

Manzo Gil's extensive experience with the criminal justice system further supports the trial court's finding of a knowing and intelligent *Miranda* waiver.  As Dr. Kania testified, Manzo Gil had been arrested "numerous" times before the interrogation in this case.[3]  Manzo Gil recalled receiving *Miranda* admonitions in connection with those prior arrests and, according to Dr. Kania, he "refused to speak [with police] on those occasions."  The fact Manzo Gil received *Miranda* admonitions during prior run-ins with

---

[3]     The probation report indicates Manzo Gil was convicted in nine prior criminal cases as an adult.  That figure does not include instances in which Manzo Gil might have been arrested, but not convicted.

the law, recalled receiving the admonitions years later, and previously invoked his right to remain silent strongly suggests he was fully aware of his *Miranda* rights and knowingly waived them in the present case. (See *People v. Parker* (2017) 2 Cal.5th 1184, 1216 [*Miranda* waiver valid where defendant "had extensive prior experience with the criminal justice system, having been arrested and pleaded guilty to felonies in three previous cases"]; *People v. Davis* (2009) 46 Cal.4th 539, 586 ["That defendant was no stranger to the criminal justice system ... reinforces our conclusion that his *Miranda* waiver ... was voluntary, knowing, and intelligent."]; *Nelson, supra*, 53 Cal.4th at p. 375 [two prior arrests showed knowing and intelligent *Miranda* waiver].)

Manzo Gil suggests his criminal history does not establish a knowing and intelligent *Miranda* waiver because he previously invoked his right to remain silent to avoid being perceived as a snitch by others—not because he wanted to avoid making statements that could be used against him in court. We are not convinced by this argument. Manzo Gil's subjective motivations for invoking his right to remain silent do not in any way detract from the fact that he received *Miranda* admonitions several times in the past and thus had multiple opportunities to hear and understand them. Nor does it undermine the fact that he apparently appreciated he *could* invoke the right to remain silent if, and for whatever reason, he so desired. His failure to do so here—juxtaposed against his past invocations of his right to remain silent—suggests a knowing and intelligent *Miranda* waiver.

Manzo Gil also contends he did not knowingly and intelligently waive his *Miranda* rights because his schizophrenia impaired his ability to engage in organized thinking and make rational decisions. We are not convinced by this argument either. We have, of course, reviewed the transcript from the interrogation and listened to the audio recording of the interrogation.

Admittedly, Manzo Gil at times provided rambling responses to some of Barajas's questions and, at other times, he referred to "Albert" and other delusional beliefs that the defense experts opined were the product of his schizophrenia. But, standing alone, "[a] schizophrenic condition does not render a defendant incapable of effectively waiving his [*Miranda*] rights." (*People v. Watson* (1977) 75 Cal.App.3d 384, 397 (*Watson*).) Rather, it is one factor to be considered, among all others, in deciding whether a defendant knowingly and intelligently waived his or her Fifth Amendment rights as outlined in *Miranda.* (See *Daoud v. Davis* (6th Cir. 2010) 618 F.3d 525, 530 (*Daoud*) ["mental illness is a factor to consider in determining whether a waiver was knowing and intelligent"]; *Coleman v. Singletary* (11th Cir. 1994) 30 F.3d 1420, 1426 ["Mental illness is one factor to be considered in determining whether a waiver was made knowingly"].)

Nothing in the record suggests Manzo Gil's mental condition precluded him from understanding his legal rights or the consequences of waiving them. Nor is there anything in the record to suggest it impaired his ability to comprehend and respond to Barajas's questions. On the contrary, Manzo Gil's responses were direct, appropriate, and on-topic, albeit sometimes lengthy. Because the record does not show that Manzo Gil's mental condition impaired his ability to understand his rights or Barajas's questions, we agree with the trial court's determination that Manzo Gil—an adult offender who received numerous *Miranda* admonitions in the past—gave a knowing and intelligent *Miranda* waiver here. (See *Watson, supra*, 75 Cal.App.3d at pp. 396–398 [*Miranda* waiver was knowing and intelligent, notwithstanding defendant's claim he had schizophrenia, brain damage, and low I.Q.]; *Daoud, supra*, 618 F.3d at pp. 528–531 [*Miranda* waiver was knowing and intelligent despite evidence defendant had mental illness]; *United States v. Turner* (8th

21

Cir. 1998) 157 F.3d 552, 555 [rejecting defendant's claim "his waiver was not knowing and intelligent because he was impaired by a low I.Q., PCP intoxication, and mental illness"]; *United States v. Robinson* (4th Cir. 2005) 404 F.3d 850, 861 ["Although [defendant] admittedly has a low I.Q. and several mental disorders, nothing in the record indicates that [he] could not understand the rights as [law enforcement] provided them."]; *Smith v. Mullin* (10th Cir. 2004) 379 F.3d 919, 932–934 [*Miranda* waiver was knowing and voluntary even though defendant had mental illness]; *United States v. Crook* (3d Cir. 1974) 502 F.2d 1378, 1381 [defendant with "chronic schizophrenia" knowingly and intelligently waived *Miranda* rights].)

4. *The Admissions Were Voluntary*

Manzo Gil moved to suppress his admissions on the additional basis that they were involuntary. In particular, he argued Barajas coerced the admissions from him by endorsing and exploiting the delusions he suffered due to his schizophrenia. The trial court rejected this argument and found "no coercion." We agree with the trial court.

" 'The Fourteenth Amendment of the federal Constitution and article I, section 7 of the California Constitution make "inadmissible any involuntary statement obtained by a law enforcement officer from a criminal suspect by coercion." ' " (*People v. Peoples* (2016) 62 Cal.4th 718, 740.) "The test for the voluntariness of a custodial statement is whether the statement is ' "the product of an essentially free and unconstrained choice" ' or whether the defendant's ' "will has been overborne and his capacity for self-determination critically impaired" ' by coercion. [Citation.] No single factor is dispositive; 'rather courts consider the totality of [the] circumstances.' [Citations.] Relevant considerations include ' "the crucial element of police coercion [citation]; the length of the interrogation [citation]; its location [citation]; its

22

continuity" as well as "the defendant's maturity [citation]; education [citation]; physical condition [citation]; and mental health." ' " (*People v. Cunningham* (2015) 61 Cal.4th 609, 642–643 (*Cunningham*).)

" 'In assessing allegedly coercive police tactics, "[t]he courts have prohibited only those psychological ploys which, under all the circumstances, are so coercive that they tend to produce a statement that is both involuntary and unreliable." ' " (*Cunningham, supra*, 61 Cal.4th at p. 643; see *People v. Williams* (2010) 49 Cal.4th 405, 436 (*Williams*) ["The question is whether the statement is the product of an ' "essentially free and unconstrained choice" ' or whether the defendant's ' "will has been overborne and his capacity for self-determination critically impaired" ' by coercion."].) " 'The question posed by the due process clause in cases of claimed psychological coercion is whether the influences brought to bear upon the accused were "such as to overbear petitioner's will to resist and bring about confessions not freely self-determined.' " (*People v. Thompson* (1990) 50 Cal.3d 134, 166 (*Thompson*).) For example, " ' "[a] confession may be found involuntary if extracted by threats or violence, obtained by direct or implied promises, or secured by the exertion of improper influence." ' " (*People v. Linton* (2013) 56 Cal.4th 1146, 1176 (*Linton*).)

"Additionally, although coercive police conduct is a necessary predicate, such conduct does not compel a finding that the resulting statement is involuntary. [Citation.] A confession is involuntary only if the coercive police conduct at issue and the defendant's statement are causally related." (*Cunningham, supra*, 61 Cal.4th at p. 643; see *Colorado v. Connelly* (1986) 479 U.S. 157, 164 (*Connelly*) ["Absent police conduct causally related to the confession, there is simply no basis for concluding that any state actor has deprived a criminal defendant of due process of law."]; *Williams, supra*, 49

23

Cal.4th at p. 437 ["A confession is not involuntary unless the coercive police conduct and the defendant's statement are causally related."].)

In the trial court, " '[t]he prosecution has the burden of establishing by a preponderance of the evidence that a defendant's confession was voluntarily made.' " (*Linton, supra*, 56 Cal.4th at p. 1176.) " 'On appeal, we conduct an independent review of the trial court's legal determination and rely upon the trial court's findings on disputed facts if supported by substantial evidence.' [Citation.] The facts surrounding an admission or confession are undisputed to the extent the interview is tape-recorded, making the issue subject to our independent review." (*Id.* at pp. 1176–1177.)

Exercising our de novo review, we conclude the totality of the circumstances show that Manzo Gil's admissions to investigator Barajas were voluntary. "We begin by noting certain factual predicates missing from [Manzo Gil's] involuntariness claim." (*People v. Spencer* (2018) 5 Cal.5th 642, 672 (*Spencer*).) He "makes 'no claim of physical intimidation or deprivation' and 'no assertion of coercive tactics other than the contents of the interrogation itself.' " (*Ibid.*) There is good reason he makes no such claim. The interrogation was relatively brief, lasting a mere 54 minutes. From the parties' briefs and the audio recording of the interrogation, there appears to be no indication that Manzo Gil was in any physical pain or discomfort, or that he was deprived of necessities like food or water, at any point during the interrogation. On the contrary, Barajas immediately offered and provided water to Manzo Gil at the outset of the relatively short interrogation. (See *Cunningham, supra*, 61 Cal.4th at p. 644 [statements are voluntary where "neither the length nor physical circumstances of the interrogation appear to have been coercive"]; *People v. DePriest* (2007) 42 Cal.4th 1, 35 [rejecting

24

claim of involuntariness where defendant "was not worn down by a lengthy interrogation or deprived of human comforts or necessities"].)

Moreover, as discussed more fully above, Manzo Gil—a 27-year old adult suspect with significant prior experience in the criminal justice system—received proper *Miranda* admonitions from Barajas before any discussion of the crimes ensued. After receiving these admonitions, Manzo Gil affirmatively acknowledged his understanding of his *Miranda* rights and knowingly and intelligently waived those rights. (*Spencer, supra*, 5 Cal.5th at p. 672 [confession voluntary where "he received *Miranda* warnings and waived his rights" before interview]; *Williams, supra*, 49 Cal.4th at p. 442 [defendant's will was not overborne, in part, because he "understood his right to counsel and to remain silent, but waived those rights"].)

Further, a single law enforcement officer—investigator Barajas—conducted the interrogation. His tone was measured and calm throughout the conversation. (See *Cunningham, supra*, 61 Cal.4th at p. 644 [no coercion where tone of interrogation was not "particularly harsh or accusatory"]; *In re Anthony L.* (2019) 43 Cal.App.5th 438, 454 [statements were voluntary where sergeant's "tone was calm and appropriate throughout"].) Moreover, Barajas at no point levied threats against Manzo Gil or his loved ones, nor did Barajas warn he would face a longer or more severe punishment if he did not admit to perpetrating sexual penetration or lewd acts against his sons.

Nonetheless, Manzo Gil contends Barajas engaged in coercive tactics because he understood Manzo Gil was suffering from a mental impairment and exploited his delusional belief in "Albert" to elicit incriminating admissions. The defendant's mental state is a factor in whether his or her statement is voluntary. (*Connelly, supra*, 479 U.S. at p. 164.) However, " 'while mental condition is surely relevant to an individual's susceptibility to

police coercion, mere examination of the confessant's state of mind can never conclude the due process inquiry.' " (*People v. Bradford* (1997) 14 Cal.4th 1005, 1045; see *People v. Dykes* (2009) 46 Cal.4th 731, 753 [rejecting involuntariness claim where defendant argued "his own unbalanced mental state rendered him susceptible to coercion"]; *Watson, supra*, 75 Cal.App.3d at pp. 395–397 [defendant who exhibited signs of chronic organic brain damage and schizophrenia made voluntary confessions].)  Rather, courts must assess whether interrogating law enforcement officers "exploited [the defendant's] psychiatric problems" in such a manner the defendant's statements were " ' "the product of an essentially free and unconstrained choice ...." ' " (*Cunningham, supra*, 61 Cal.4th at pp. 642, 644; see *Smith, supra*, 40 Cal.4th at p. 502 [rejecting involuntariness claim where there was no indication the "interrogating officers were aware of, or exploited, defendant's claimed psychological vulnerabilities in order to obtain statements from him"].)

Here, the record corroborates Manzo Gil's claim that Barajas likely became aware fairly early in the interrogation he suffered from a mental impairment marked by delusional thinking and auditory hallucinations. Indeed, shortly after Barajas began questioning Manzo Gil about the alleged crimes, Manzo Gil said he wanted to discuss "this guy named Albert" who spoke to him "telepathically."  The record also shows Barajas repeatedly asked Manzo Gil whether and how many times "Albert" had influenced him to kiss his boys with his tongue, give them "butt massages," or touch them inappropriately.  Further, it establishes that Barajas, at times, referenced "Albert" in an apparent effort to convey to Manzo Gil his own conduct was minimally culpable.  Most notably, he told Manzo Gil it was "completely understandable" that "Albert" influenced him because "Albert" was "pretty influential" and he was "in [Manzo Gil's] head telling [him] to do this stuff."

26

These and other similar comments and questions encroached near, but did not transgress, the threshold of coercion.  While Barajas referenced Manzo Gil's delusional belief in "Albert" several times during the interrogation and inquired whether "Albert" had influenced him to engage in misconduct, Barajas did not leverage Manzo Gil's belief in "Albert" in a way that overtook Manzo Gil's will to resist, nor did he use "Albert" to extract compulsory confessions from him.  Barajas did not reference "Albert" to threaten or frighten Manzo Gil by, for example, warning that "Albert" would punish him or compel him to commit further lewd acts unless he confessed his crimes.  He also did not induce Manzo Gil to admit the crimes through promises of leniency or guarantees relating to "Albert," like promising that Barajas could protect him from "Albert" if he admitted his crimes.  Instead, throughout the interrogation, Barajas proposed "Albert" as a motive for Manzo Gil's conduct and inquired whether Manzo Gil perpetrated the lewd acts in furtherance of that motive.  Law enforcement may suggest " 'possible explanations of ... events and offer[] defendant an opportunity to provide the details of the crime.  This tactic is permissible.' " (*Williams, supra*, 49 Cal.4th at p. 444; *Spencer, supra*, 5 Cal.5th at p. 674 ["an interrogation may include ' "exchanges of information, summaries of evidence, outline of theories of events, confrontation with contradictory facts, even debate between police and suspect." ' "].)

Admittedly, there was a degree of deception insofar as Barajas implied that "Albert" was real.  " '[D]eception is a factor which weighs against a finding of voluntariness.' " (*Thompson, supra*, 50 Cal.3d at p. 167.)  However, "the use of deceptive comments does not necessarily render a statement involuntary.  Deception does not undermine the voluntariness of a defendant's statements to the authorities unless the deception is ' " 'of a type

27

reasonably likely to procure an untrue statement.' " ' [Citations.] ' "The courts have prohibited only those psychological ploys which, under all the circumstances, are so coercive that they tend to produce a statement that is both involuntary and unreliable." ' " (*Williams, supra*, 49 Cal.4th at p. 443.) Here, for the reasons just discussed—namely, the fact that Barajas did not leverage "Albert" to threaten or make false promises of leniency to Manzo Gil—we conclude Barajas's deception was not so coercive that it produced involuntary and unreliable statements.

We are also convinced Barajas's interrogation tactics were not so coercive as to deprive Manzo Gil of his capacity for self-determination based, in part, on how Manzo Gil responded to several of Barajas's references to "Albert." Even after Barajas asked Manzo Gil whether "Albert" had tried to persuade him to kiss or inappropriately touch his sons, Manzo Gil continually rejected the insinuation that he had engaged in such misconduct to sexually gratify himself. Indeed, in his opening brief, Manzo Gil states he "repeatedly denied that his conduct had been sexual in nature," and claimed he was simply "playing with his sons," notwithstanding Barajas's seeming efforts to elicit more damaging admissions that his conduct was sexual.

For example, 38 minutes into the interrogation, Barajas said "Albert" had influenced Manzo Gil and gotten him to "do things for him," and Manzo Gil agreed. Barajas then asked whether "Albert" had gotten Manzo Gil to touch John Doe 1's butt and Manzo Gil replied, "I really haven't touched them like in a perverted way." Similarly, towards the end of the interrogation, Barajas asked Manzo Gil whether Albert had influenced him to masturbate to what he had "done with [his] boys," and Manzo Gil replied, "Not - not - not with my boys - with my wife." Shortly after, Barajas

28

questioned whether Manzo Gil got turned on by touching his sons and he replied, "No ... I never done it in a rapist way."

Moreover, Barajas asked whether "Albert" had influenced Manzo Gil to engage in certain types of misconduct and Manzo Gil denied he had done so. For instance, the following exchange occurred 31 minutes into the interrogation: "Barajas: ... Albert is influencing you. How many times have you acted on his influence to touch the kids? [¶] Manzo [Gil]: I really ... [¶] Barajas: Be honest. [¶] Manzo [Gil]: ... I - I haven't - I haven't really acted like that .... Barajas: What - what - what else did Albert tell you to do to the kids? Made you massage their butt? [¶] Manzo [Gil]: No. No. [¶] Barajas: Efrain. [¶] Manzo [Gil]: No he hasn't told me that. [¶] Barajas: Efrain. Efrain. [¶] Manzo [Gil]: He hasn't told me that."

A few minutes later, a similar exchange occurred, "Manzo [Gil]: I don't massage their butts. I haven't massaged a butt. [¶] Barajas: Again the boys said you did. [¶] Manzo [Gil]: That's what they're saying but I - I - I know personally ... [¶] Barajas: The boys told me you did. [¶] Manzo [Gil]: I haven't so how do you want me to tell you that I have? [¶] Barajas: The boys - I'm thinking that Albert influenced you. [¶] Manzo [Gil]: But I haven't."

Likewise, when Barajas asked Manzo Gil whether "Albert" had influenced him to engage in misconduct that was not charged in this case, Manzo Gil denied engaging in such behavior, while simultaneously admitting that "Albert" had tried to convince him to do so. For instance, the following exchange occurred 45 minutes into the interrogation: "Barajas: Okay. How about putting your mouth on their penis? Have you ever done that? [¶] Manzo [Gil]: No. [¶] Barajas: I'm just asking. Has Albert ever asked you? Has Albert influenced you ... [¶] Manzo [Gil]: Yes, yes yes. [¶] Barajas: ... to put your mouth on their penis? [¶] Manzo [Gil]: Yes. [¶] Barajas: How many

29

times has he asked you to do it? [¶] Manzo [Gil]: Like two or three times. [¶] Barajas: And how many times did you do it? [¶] Manzo [Gil]: None. None[.] [¶] Barajas: Be honest with me. [¶] Manzo [Gil]: It's the truth."

Manzo Gil's repeated denials that "Albert" convinced him to engage in various types of charged and uncharged misconduct, or to perpetrate the charged crimes for sexual purposes, suggest Barajas's numerous references to "Albert" did not overcome Manzo Gil's will to resist. If they had, one would reasonably expect Manzo Gil to have admitted to these acts and motives as well. Manzo Gil's continued resistance in the face of Barajas's questioning "is not the behavior of one whose free will has been overborne." (*People v. Johns* (1983) 145 Cal.App.3d 281, 293; see *Williams, supra,* 49 Cal.4th at p. 444 [statements voluntary where defendant "continued to deny responsibility in the face of the officers' assertions"]; *People v. Coffman & Marlow* (2004) 34 Cal.4th 1, 58 [defendant's "resistance, far from reflecting a will overborne by official coercion, suggests instead a still operative ability to calculate his self-interest in choosing whether to disclose or withhold information."].)

Considering the totality of the circumstances, including the relatively brief duration of the interrogation, Barajas's calm and measured tone, Barajas's administration of proper *Miranda* warnings, Manzo Gil's knowing and intelligent *Miranda* waiver, Manzo Gil's age and past experience with the criminal justice system, the absence of any express or implied threats or promises of leniency, and Manzo Gil's repeated denials of certain types of improper conduct and motives, we conclude that Manzo Gil's admissions during the custodial interrogation were voluntary. Because Manzo Gil's admissions were voluntary, the trial court properly granted the prosecution's motion in limine and denied Manzo Gil's motion to suppress.

B. *The Trial Court Did Not Commit Prejudicial Error by Limiting Dr. Kania's Testimony*

Manzo Gil also contends the trial court erred by precluding his expert, Dr. Kania, from testifying that his schizophrenia may have caused him to be confused and misled by the questions posed to him by Barajas during the interrogation. We need not reach the merits of this argument because, assuming the court abused its discretion in limiting the expert testimony, it is not reasonably likely Manzo Gil would have achieved a more favorable outcome if the court had admitted the disputed testimony.

1. *Additional Background*

During the guilt phase of trial, Manzo Gil filed a motion asking the court to allow Dr. Kania to testify about his mental condition at the time of the offenses and at the time of his interrogation. With respect to his mental condition at the time of the offenses, the defense planned to elicit testimony that Manzo Gil's schizophrenia prevented him from making free or rational choices. As for his mental condition at the time of the interrogation, the defense intended to procure testimony that Manzo Gil's schizophrenia may have caused him to be confused and to be misled by investigator Barajas's endorsement of his delusions and hallucinations during the interrogation.

In response to this filing, the prosecution filed its own motion to limit Dr. Kania's testimony. It argued that sections 28 and 29 barred Dr. Kania's proffered testimony concerning Manzo Gil's capacity for free or rational

31

choice at the time of the crimes.[4] The prosecution did not discuss Dr. Kania's proffered testimony concerning the effects of Manzo Gil's mental condition at the time of the interrogation.

Outside the presence of the jury, the court ruled that Dr. Kania could testify that he diagnosed Manzo Gil with schizophrenia. The court ruled he could also discuss the symptoms schizophrenic persons commonly experience. However, the court precluded Dr. Kania from testifying that Manzo Gil was incapable of free or rational choice at the time of his crimes. The court also prohibited Dr. Kania from testifying that Manzo Gil's schizophrenia may have caused him to be confused or misled during the interrogation.

The court's rationale for limiting Dr. Kania's testimony is not the model of clarity. However, the court's central concern appeared to be that Dr. Kania did not have a proper foundation to discuss how Manzo Gil's mental condition affected him during the interrogation. In particular, the court emphasized that Dr. Kania did not administer any tests on Manzo Gil pertinent to his mental cognition. The court opined that, in its experience, experts who

---

[4]     Section 28 states, in pertinent part, "Evidence of mental disease, mental defect, or mental disorder shall not be admitted to show or negate the capacity to form any mental state, including, but not limited to, purpose, intent, knowledge, premeditation, deliberation, or malice aforethought, with which the accused committed the act. Evidence of mental disease, mental defect, or mental disorder is admissible solely on the issue of whether or not the accused actually formed a required specific intent, premeditated, deliberated, or harbored malice aforethought, when a specific intent crime is charged." (§ 28, subd. (a).)

Section 29 provides, "In the guilt phase of a criminal action, any expert testifying about a defendant's mental illness, mental disorder, or mental defect shall not testify as to whether the defendant had or did not have the required mental states, which include, but are not limited to, purpose, intent, knowledge, or malice aforethought, for the crimes charged. The question as to whether the defendant had or did not have the required mental states shall be decided by the trier of fact." (§ 29.)

testify about persons suffering from schizophrenia base their conclusions on cognitive tests they personally have administered to the persons.[5]

## 2. *Analysis*

Manzo Gil argues the trial court erred by precluding Dr. Kania from testifying about whether his schizophrenia may have caused him to be confused or misled by investigator Barajas during the custodial interrogation. "[A] trial court's ruling excluding or admitting expert testimony is generally reviewed for abuse of discretion. [Citation.] 'A ruling that constitutes an abuse of discretion has been described as one that is "so irrational or arbitrary that no reasonable person could agree with it." ' " (*Onglyza Product Cases* (2023) 90 Cal.App.5th 776, 784.)

Even if a trial court abuses its discretion in limiting expert testimony, appellate reversal is only warranted where the appellant establishes that the error was prejudicial. (*TriCoast Builders, Inc. v. Fonnegra* (2024) 15 Cal.5th 766, 786 ["The constitutional constraint [set forth in article VI, section 13 of the California Constitution], which applies in civil as well as criminal cases, 'generally "prohibits a reviewing court from setting aside a judgment due to trial court error unless it finds the error prejudicial." ' "].) In the context of an erroneous evidentiary ruling like the one asserted here, the appellant must establish that it is reasonably probable he or she would have obtained a

---

[5] In his opening brief, Manzo Gil argues that the trial court erred by misapplying sections 28 and 29 to limit Dr. Kania's testimony about how his schizophrenia impacted him during the interrogation. However, as noted, the most reasonable interpretation of the court's ruling is that it did not rely on sections 28 and 29 as the basis for its evidentiary ruling; rather, it found Dr. Kania lacked a proper foundation to testify about how Manzo Gil's schizophrenia impacted him during the interrogation. In his reply brief, Manzo Gil concedes the trial court appeared to harbor "a concern with [the] foundation for Dr. Kania's opinion[,]" although the basis for the court's ruling is not "entirely clear" from the record.

more favorable outcome in the absence of the error. (See *People v. Caparaz* (2022) 80 Cal.App.5th 669, 686–687 (*Caparaz*) [applying prejudice standard from *People v. Watson* (1956) 46 Cal.2d 818 to assess prejudice from exclusion of expert testimony concerning susceptibility to false confessions].)

We need not decide whether the trial court abused its discretion in limiting Dr. Kania's testimony because, assuming error, it is not reasonably likely Manzo Gil would have achieved a more favorable outcome but-for the error. Although the court did not permit Dr. Kania to testify on the discrete topic of whether Manzo Gil was confused or misled during the interrogation, it allowed him to testify extensively about Manzo Gil's mental health and the symptoms commonly experienced by individuals like Manzo Gil who suffer from schizophrenia. Dr. Kania testified that he and "three or four, five [other] doctors" diagnosed Manzo Gil with schizophrenia. He explained that people with schizophrenia "usually" suffer from "disorganized thinking where the person has trouble thinking clearly in a logical way." He said they may experience "a disturbance of perception" and suffer from delusions, which causes them to "put the facts together in the wrong way." Further, he testified that a person with schizophrenia can suffer from "impairment of communication" and face difficulties responding to questions appropriately.

Dr. Kania also told the jury these symptoms wax and wane, but whether a person with schizophrenia is medicated "make[s] a big difference in [terms of] their ability to communicate and to function." He added that, "if they aren't taking medication or if they're going through a particularly rough time, they may have difficulty providing any kind of relevant or rational information" when narrating their own lives. At trial, there was ample evidence—including testimony from Manzo Gil and his family members— that he stopped taking medications for his schizophrenia after he returned to

34

the United States from the psychiatric treatment hospital he visited in Mexico. Dr. Kania explained that Manzo Gil was "severely impaired," it was "hard for him to think clearly," and he suffered from delusions and auditory hallucinations due to his schizophrenia. According to Dr. Kania, Manzo Gil continued to suffer from these symptoms even after he was medicated in connection with his restoration of competence proceedings.

Additionally, there was already evidence in the record tending to show that Barajas's questioning style potentially could result in unreliable admissions. For example, Dr. Kania testified that, within the context of therapy, it is inadvisable to endorse the delusions of a schizophrenic person because it does not help the person "clearly see reality." In fact, even Barajas testified that leading questions—like the ones he posed to Manzo Gil—tend to produce answers from interviewees that are designed to please the interviewer.

Further, the defense argued extensively during closing arguments that Manzo Gil was confused and misled by Barajas during the interrogation. The defense argued Barajas "exploit[ed] [Manzo Gil's] mental illness" during the interrogation and "embrace[d]" his delusions by telling him "what this entity [called "Albert"] told [him], what this entity influenced [him] to do, what [he] actually did." The defense continued, "[W]hen you're talking about someone with the degree of mental illness that Mr. Manzo Gil was suffering from, where he's literally hearing voices, where that confusion is going on, there's no way to discern whether what he's telling you at any given instant in that interview is something that Albert is influencing him to say, that Albert has influenced him to say in the past, that Albert has directed him to do, or that Albert actually made him do, or he's just saying he did it. Fundamentally its unreliable evidence ...." Later, defense counsel discussed Barajas's leading

35

questions and his endorsement of "Albert" further, and argued that Barajas "exploit[ed] someone's mental illness to have them make admissions that [had] no contact with reality."

Thus, the record contained plentiful evidence that, at the time of the interrogation, Manzo Gil was unmedicated and suffered from schizophrenia that "severely impaired" him and made it "hard for him to think clearly." The jury also received ample evidence that people with schizophrenia often suffer from disorganized thinking, a distorted perception of reality, and an inability to "put the facts together" correctly; and these symptoms are usually more common—and exacerbated—where, as here, the person with schizophrenia is unmedicated. Based on this evidence, the defense vigorously argued to jury that Manzo Gil was confused and misled by Barajas's endorsement of his schizophrenic delusions. And yet, the jury *still* returned guilty verdicts on counts 2 and 3, thus impliedly rejecting the defense's position that Manzo Gil's admissions were insufficiently reliable due to his purported confusion and Barajas's interrogation tactics. On this record, we cannot say it is reasonably likely additional testimony from Dr. Kania about Manzo Gil's possible confusion would have ensured a more favorable outcome for the defense. (See *Caparaz, supra*, 80 Cal.App.5th at pp. 685–687 [erroneous exclusion of expert testimony concerning defendant's susceptibility to false confessions was harmless, in part, because jury already heard evidence the defendant had low education level, was interrogated in his non-predominant language, had no prior law enforcement history, and was easily convinced, variables that could cause a person to be suspectable to false confessions].)

C. *The Trial Court Did Not Err While Instructing the Jury on NGI*

Next, Manzo Gil asserts the trial court erred by instructing the jury that the defense of NGI is unavailable as a matter of law when a defendant's

36

addiction to, or abuse of, intoxicating substances is the sole cause of his or her insanity. He claims the instruction was inapplicable because substantial evidence did not support a jury finding that his alleged insanity was caused solely by his methamphetamine abuse or, alternatively, that his alleged insanity resulted from schizophrenia that itself was caused solely by his methamphetamine abuse. For reasons we will explain, we conclude the court did not commit instructional error.

      1. *Legal Principles*

"If a defendant pleads both not guilty and not guilty by reason of insanity, the trial is bifurcated. In the guilt phase of the trial, which occurs first, the defendant is conclusively presumed to have been legally sane at the time of the offense. [Citations.] If the defendant is found guilty, the trial proceeds to the sanity phase, in which the defendant has the burden to prove 'by a preponderance of the evidence that he or she was incapable of knowing or understanding the nature and quality of his or her act and of distinguishing right from wrong at the time of the commission of the offense.' " (*People v. McCarrick* (2016) 6 Cal.App.5th 227, 246 (*McCarrick*), quoting § 25, subd. (b).) "Our Supreme Court has interpreted this statutory language to mean that insanity can be shown under either the 'nature and quality' prong or the 'right from wrong' prong of the test." (*McCarrick*, at p. 246.) Although mental illness can cause insanity, the two concepts are not synonymous and mental illness "alone does not necessarily establish legal insanity." (*People v. Kelly* (1992) 1 Cal.4th 495, 540.)

The insanity defense is unavailable under certain circumstances outlined in section 29.8. Section 29.8 states, in pertinent part, "In any criminal proceeding in which a plea of not guilty by reason of insanity is entered, *this defense shall not be found by the trier of fact solely on the basis*

*of* a personality or adjustment disorder, a seizure disorder, or *an addiction to, or abuse of, intoxicating substances*." (Italics added.) Stated differently, section 29.8 "provides that if an accused's insanity is caused *solely* by abuse of or addiction to intoxicating substances, then the insanity defense is not available to him or her." (*People v. Robinson* (1999) 72 Cal.App.4th 421, 427 (*Robinson*).) "By enacting this statute, the Legislature expressed its intent that individuals rendered insane solely because of their substance abuse should be treated differently than those afflicted by mental illness through no conscious volitional choice on their part." (*Id.* at p. 428.)[6]

Section 29.8 " 'makes no exception for brain damage or mental disorders caused solely by one's voluntary substance abuse but which persists after the immediate effects of the intoxicant have dissipated. Rather, it erects an absolute bar prohibiting use of one's voluntary ingestion of intoxicants as the sole basis for an insanity defense, regardless whether the substances caused organic [brain] damage or a settled mental disorder which persists after the immediate effects of the intoxicant have worn off.' " (*McCarrick, supra*, 6 Cal.App.5th at p. 247, quoting *Robinson, supra*, 72 Cal.App.4th at p. 427; see *People v. Cabonce* (2009) 169 Cal.App.4th 1421, 1434 ["there can be no insanity defense when the inability to tell right from wrong derived (1) solely from an addiction or abuse of intoxicating substances, *or* (2) from a mental defect or disorder that itself was caused solely by such addiction or abuse"].) However, "[w]here the mental disease or defect is caused *in part* by an addiction or abuse of alcohol," the insanity

---

6      Manzo Gil's unopposed request for judicial notice of a legislative committee report concerning Senate Bill No. 40 (1993–1994 1st Ex. Sess.), which became the predecessor statute to section 29.8, is granted. (Evid. Code, § 452, subd. (c).)

defense might or might not apply; its availability presents a question of fact for the jury to resolve based on the evidence presented. (*Cabonce*, at p. 1436.)

2. *Analysis*

At the end of the sanity phase of trial, the court instructed the jury with the standard insanity jury instruction, CALCRIM No. 3450, and included an optional portion of the instruction setting forth the rule codified in section 29.8. The optional portion stated, "Special rules apply to an insanity defense involving drugs or alcohol. Addiction to or abuse of drugs or intoxicants, by itself, does not qualify as legal insanity. This is true even if the intoxicants cause organic brain damage or a settled mental disease or defect that lasts after the immediate effects of the intoxicants have worn off. Likewise, a temporary mental condition caused by the recent use of drugs or intoxicants is not legal insanity. [¶] If the defendant suffered from a settled mental disease or defect caused by the long-term use of drugs or intoxicants, that settled mental disease or defect combined with another mental disease or defect may qualify as legal insanity. A settled mental disease or defect is one that remains after the effect of the drugs or intoxicants has worn off."

The defense objected to the optional portion of the instruction on grounds that there was insufficient evidence to support the giving of the instruction. However, the defense did not object to the phrasing of the optional portion of the instruction, contend it was ambiguous or misleading, or request clarification about its meaning.

On appeal, Manzo Gil renews his objection to the optional portion of the jury instruction and again argues it lacked evidentiary support. He claims there was insufficient evidence to prove that, at the time of the crimes, he suffered from a methamphetamine-induced psychosis caused solely by his addiction to, or abuse of, methamphetamine. Further, he suggests his

39

claimed insanity was indisputably the product of his schizophrenia and there was no evidence his methamphetamine abuse was the *sole* cause of the schizophrenia; rather, he claims, schizophrenia has a genetic component and expresses itself when one uses methamphetamine. In other words, he contends that his methamphetamine abuse was just one of multiple factors that caused his schizophrenia, which in turn caused his insanity.

" 'A trial court must give a requested instruction only if it is supported by substantial evidence, that is, evidence sufficient to deserve jury consideration.' [Citation.] ' "[T]here need only be some evidence in the record that, if believed by the jury, would sufficiently support the suggested inference." ' " (*People v. Byers* (2021) 61 Cal.App.5th 447, 456–457.) An appellate court reviews the trial court's decision to give a particular jury instruction de novo. (*People v. Cole* (2004) 33 Cal.4th 1158, 1206.)

Based on our review of the record, we conclude there was substantial evidence to support a finding that Manzo Gil's addiction to, or abuse of, methamphetamine was the sole cause of his claimed insanity; thus, the court properly instructed the jury with the optional portion of the insanity instruction derived from section 29.8. At the sanity trial, all three experts testified that methamphetamine users can experience methamphetamine-induced psychosis. As prosecution expert Dr. Walsh explained, a person can experience psychosis and lose the ability to perceive his or her environment accurately after consuming methamphetamine just once (if the drug dosage is sufficiently high). Or, he explained, consistent methamphetamine usage may significantly disrupt a user's sleep cycle, which inhibits brain regeneration and causes the user to experience a distorted perception of reality. All three experts testified that methamphetamine-induced psychosis can cause brain

40

damage and become a chronic condition that persists well after the person halts his or her use of methamphetamine.

Manzo Gil reported to both parties' expert witnesses that he regularly used methamphetamine. He told Dr. Walsh, the prosecution expert, that he began to use methamphetamine when he was 16 years old and later used it on a daily basis, including during the latter half of 2013 and the first half of 2014 when the lewd acts at issue occurred. And, based on her interview with Manzo Gil and her review of his medical and police records, Dr. Smith-Clark agreed with the prosecutor that Manzo Gil used methamphetamine "very heavily" and "all the way through" his early adulthood.

After he started using methamphetamine, Manzo Gil exhibited psychotic symptoms that all three experts observed in their interactions with him—namely, auditory and visual hallucinations, paranoia, and disorganized thinking. Both Dr. Wilkinson and Dr. Walsh said these symptoms are consistent with methamphetamine-induced psychosis. Moreover, all three experts testified that visual hallucinations, like those experienced by Manzo Gil, are more common with methamphetamine-induced psychosis when compared to schizophrenia.

Based on Manzo Gil's presentation and his reported history of daily methamphetamine use, Dr. Walsh offered methamphetamine-induced psychosis as one of three plausible explanations for his mental state at the time he committed the crimes (along with naturally occurring schizophrenia or schizophrenia triggered or exacerbated by his methamphetamine use). Dr. Wilkinson diagnosed Manzo Gil with schizophrenia (not methamphetamine-induced psychosis), but she could not rule out methamphetamine-induced psychosis as a possibility. Moreover, although Dr. Smith-Clark testified that Manzo Gil had an unspecified psychotic

41

disorder, she also testified that his heavy methamphetamine use might have been a cause of his psychosis.

On this record, we conclude there was substantial evidence to support a jury finding that Manzo Gil suffered from methamphetamine-induced psychosis and his use of methamphetamine was the sole cause of his claimed insanity at the time he perpetrated the crimes for which he was convicted. (See *McCarrick, supra*, 6 Cal.App.5th at pp. 247–248 [substantial evidence supported jury's finding that methamphetamine abuse caused defendant's psychotic symptoms where there was evidence she had a long history of methamphetamine abuse, even though expert witnesses at sanity trial unanimously attributed her mental condition, at least in part, to other causes].) Thus, the trial court correctly instructed the jury with the optional portion of CALCRIM No. 3450 derived from section 29.8.[7]

D. *The Indeterminate Sentence Is Not Cruel or Unusual Punishment*

Generally, a person convicted of perpetrating a lewd or lascivious act on a minor under the age of 14 years may be sentenced to prison for three, six, or eight years. (§ 288, subd. (a).) However, under the One Strike law, the punishment for such a conviction is aggravated to 15 years to life where it is found that the person perpetrated a lewd or lascivious act against more than

---

[7]    Manzo Gil also contends the optional portion of CALCRIM No. 3450 was ambiguous or misleading because, he claims, it impermissibly allowed the jury to find he was sane even if it believed his methamphetamine abuse and his genetically based schizophrenia, in combination, produced his altered mental state. However, he did not object to the phrasing of the optional portion of the instruction in the proceedings below or request clarification from the trial court. By failing to object or request that the court amplify or clarify its instruction, Manzo Gil has forfeited his argument that the instruction was misleading or ambiguous. (*People v. Orloff* (2016) 2 Cal.App.5th 947, 958; *People v. Mejia* (2012) 211 Cal.App.4th 586, 636.)

one victim.[8]  (§ 667.61, subds. (b), (c)(8), (e)(4).)  Here, the jury found Manzo Gil perpetrated lewd acts against multiple victims (John Does 1 and 2).

Pursuant to the One Strike law, the trial court sentenced Manzo Gil to an aggregate term of 30 years to life, consisting of consecutive terms of 15 years to life for each of the two lewd act convictions.  On appeal, Manzo Gil claims his sentence is so grossly disproportionate to the nature of his crimes and his culpability as an offender that it violates the state and federal constitutional proscriptions against cruel and/or unusual punishment.

The Eighth Amendment to the federal constitution, which applies to the states, provides in full, "Excessive bail shall not be required, nor excessive fines imposed, nor cruel *and* unusual punishments inflicted."  (U.S. Const., 8th Amend., italics added; *People v. Caballero* (2012) 55 Cal.4th 262, 265, fn. 1.)  Article I, section 17 of the California Constitution declares, "Cruel *or* unusual punishment may not be inflicted or excessive fines imposed." (Cal. Const., art. I, § 17, italics added.)  " 'The distinction in wording is "purposeful and substantive rather than merely semantic.  [Citations.]" [Citation.].)  As a result, we construe the state constitutional provision "separately from its counterpart in the federal Constitution." ' " (*Baker*, *supra*, 20 Cal.App.5th at p. 723.)

"Whether a punishment is cruel or unusual is a question of law for the appellate court, but the underlying disputed facts must be viewed in the light most favorable to the judgment." (*People v. Martinez* (1999) 76 Cal.App.4th 489, 496.)

---

8    Enacted in 1994, the One Strike Law "imposes lengthy indeterminate terms of 15 years to life or 25 years to life for defendants convicted of specified sexual offenses if certain aggravating factors are found true." (*People v. Baker* (2018) 20 Cal.App.5th 711, 729 (*Baker*).)

1. *The Sentence Does Not Violate the State Constitutional Prohibition Against Cruel or Unusual Punishment*

"A punishment is cruel or unusual in violation of the California Constitution 'if, although not cruel or unusual in its method, it is so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity.' [Citation.] Because it is the Legislature's function to define crimes and prescribe punishments, the judiciary should not interfere 'unless a statute prescribes a penalty "out of all proportion to the offense." ' " (*Baker, supra*, 20 Cal.App.5th at p. 723; see also *People v. Wingo* (1975) 14 Cal.3d 169, 174 ["The doctrine of separation of powers is firmly entrenched in the law of California, and a court should not lightly encroach on matters which are uniquely in the domain of the Legislature. Perhaps foremost among these are the definition of crime and the determination of punishment."].) "Findings of disproportionality are exceedingly rare and occur only in extraordinary cases." (*People v. Wilson* (2020) 56 Cal.App.5th 128, 167 (*Wilson*); see *People v. Perez* (2013) 214 Cal.App.4th 49, 60 [successful appellate challenges to criminal punishments based on gross disproportionality are "extremely rare"].)

We employ "three 'techniques' to determine whether a sentence is so disproportionate to the crime as to constitute cruel or unusual punishment. [Citation.] We first consider 'the nature of the offense and/or the offender, with particular regard to the degree of danger both present to society.' [Citation.] Next, we compare the sentence to 'punishments prescribed in the *same jurisdiction* for *different offenses* which, by the same test, must be deemed more serious.' [Citation.] Finally, we compare the sentence 'with the punishments prescribed for the *same offense* in *other jurisdictions* having an identical or similar constitutional provision.' [Citation.] The weight afforded to each prong may vary by case. [Citation.] 'Disproportionality need not be

established in all three areas.' " (*Baker, supra*, 20 Cal.App.5th at p. 723.) "In reviewing an indeterminate sentence, 'it is the maximum term prescribed by the statute—not a lesser period thereafter fixed as an "incentive to well-doing"—which must survive constitutional scrutiny.' " (*Ibid.*) Thus, in evaluating the constitutionality of Manzo Gil's sentence of 30 years to life, "we must consider whether a life sentence withstands constitutional scrutiny, notwithstanding his parole eligibility in [30] years." (*Ibid.*)

With regard to the first technique, the "[f]actors to consider in evaluating the nature of the offense include the seriousness of the offense and the presence of violence, victims, or aggravating circumstances." (*Baker, supra*, 20 Cal.App.5th at p. 724.) "We also evaluate whether the punishment fits *the criminal*." (*Ibid.*) Consideration of all these factors compels us to conclude that the life sentence imposed in this case is valid and proportionate to the serious sexual crimes Manzo Gil perpetrated against his minor sons.

"Along a spectrum ranging from murder, mayhem, and torture on one end to petty theft on the other, 'lewd conduct on a child may not be the most grave of all offenses, but its seriousness is considerable.' " (*Baker, supra*, 20 Cal.App.5th at pp. 724–725, quoting *People v. Christensen* (2014) 229 Cal.App.4th 781, 806 (*Christensen*); see *Ashcroft v. Free Speech Coalition* (2002) 535 U.S. 234, 244 ["sexual abuse of a child is a most serious crime and an act repugnant to the moral instincts of a decent people"].) Here, Manzo Gil was convicted of perpetrating lewd sexual acts against two of his three minor sons in violation of section 288, subdivision (a), for putting his tongue inside their mouths and rolling it around while he kissed them—all with the intent to arouse or gratify his sexual desires or those of his sons. These were serious and destructive sex crimes committed against young children.

45

The evidence showed these lewd acts were not discrete or isolated actions. The jury found Manzo Gil kissed two of his sons in this manner. As John Doe 1 stated during his RCAT interview, Manzo Gil repeatedly kissed him while using his tongue—ten times in total. Manzo Gil—the father of both victims—acted alone and abused a position of trust to perpetrate these crimes against his sons. (See *People v. Gomez* (2018) 30 Cal.App.5th 493, 501 [rejecting cruel and unusual punishment claim, reasoning the "[d]efendant, an adult, was in the position of a father figure to the victim, who was a child of very tender years when the molestation began"].) Further, the victims were just four and five years old when Manzo Gil stuck his tongue inside their mouths, thus aggravating the seriousness and depravity of the crimes. (See *Wilson, supra*, 56 Cal.App.5th at p. 169 ["the vulnerability of the girls given their young age is an aggravating circumstance"].)

Manzo Gil argues his sentence was disproportionate to his crimes, in part, because he claims he did not physically or psychologically harm his sons. Along similar lines, he claims his sons "did not hold their father's conduct against him" at trial. These arguments do not establish disproportionality. Irrespective of whether a defendant inflicts physical harm or violence on a victim, " '[t]here exists a strong public policy to protect children of tender years.' " (*Baker, supra*, 20 Cal.App.5th at p. 724, quoting *People v. Olsen* (1984) 36 Cal.3d 638, 646.) In accordance with this public policy, Manzo Gil " 'did not have to hurt [his sons] in order to do permanent psychological damage.' [Citation.] Courts have recognized that lewd conduct 'may have lifelong consequences to the well-being of the child.' " (*Baker,* at p. 725; see also *People v. Reyes* (2016) 246 Cal.App.4th 62, 85 (*Reyes*) ["It is of no moment that [the defendant] did not use violence or physically injure [the victim]; he did not have to hurt her in order to do permanent psychological

46

damage."]; accord *J.C. Penney Casualty Ins. Co. v. M.K.* (1991) 52 Cal.3d 1009, 1026 ["Child molestation is not the kind of act that results in emotional and psychological harm only occasionally."].)

Here, John Doe 1 disclosed to the RCAT interviewer that his father did "nasty stuff" to him, like kissing him with his tongue. John Doe 1 said "no" to his father, but his father "ke[pt] on doing it." John Doe 1 also said it "hurt a lot" when his father poked his anus. Similarly, John Doe 2 described Manzo Gil's behavior—sticking his tongue inside his mouth and rolling it around— as "[m]ean stuff." And at trial, John Doe 1 stated he was "holding something back" while he was testifying because he did not "want [Manzo Gil] to stay" in jail. At minimum, these accounts undercut Manzo Gil's unconvincing contention that his crimes were essentially harmless and victimless.

The culpability of the offender, Manzo Gil, also does not demonstrate that his punishment is disproportionate to the crime. During the sanity phase of trial, the jury received evidence that Manzo Gil suffered from schizophrenia (from Dr. Wilkinson), or an unspecified psychotic disorder with symptoms that were consistent with schizophrenia (from Dr. Smith-Clark), and it heard evidence that, based on his mental illness, he likely was incapable of knowing the nature of his acts or distinguishing right from wrong. However, it *also* received evidence, in the form of expert testimony provided by Dr. Walsh, that Manzo Gil could have been laboring under the effects of a drug-induced psychosis (instead of schizophrenia), and he likely understood the difference between right and wrong when he committed his crimes. After receiving *all* of this evidence, the jury found Manzo Gil was sane when he committed the lewd sexual acts against his sons.

Separate and apart from Manzo Gil's mental condition, we are mindful that he was an adult offender with an extensive criminal history at the time

he perpetrated his crimes. Moreover, according to his Static-99R risk assessment, he has an average risk of reoffending within five years after his release from custody—not a low risk. Considering all these factors, this is not one of the "exceedingly rare" cases in which the legislatively prescribed punishment is so disproportionate to the crime or the offender that it shocks the conscience. (*Wilson, supra*, 56 Cal.App.5th at p. 167; see *People v. Boyce* (2014) 59 Cal.4th 672, 719 [the Supreme Court has "rejected claims that a defendant's low IQ, brain damage, and/or mental illness render his capital sentence grossly disproportionate to his crime"].)

Turning to the second technique used to assess proportionality, Manzo Gil argues his sentence is constitutionally infirm because it is more severe than the maximum punishment our state sets for other "more serious" sex crimes involving minors, including pimping and pandering a child under the age of 16 years old (§§ 266h, subd. (b)(2), 266i, subd. (b)(2); eight years); abducting a minor for prostitution (§§ 18, 266, subd. (a); three years); sexual penetration or sodomy of a person who is under the age of 14 years or ten or more years younger than the offender (§§ 286, subd. (c)(1), 289, subd. (j); eight years); and sexual battery against a minor by an offender with a prior felony sexual battery conviction (§ 243.4, subds. (a), (j); four years).

For most of the crimes Manzo Gil has identified (all but the last crime), Manzo Gil's comparison is inapt. For each of these crimes, the maximum punishment imposed is based on a single conviction involving a single victim. Here, by contrast, the sentence of 30 years to life is based on the jury's finding that Manzo Gil committed *multiple* lewd acts on *multiple* minor victims. " 'The penalties for single offenses ... cannot properly be compared to those for multiple offenses ....' " (*Christensen, supra*, 229 Cal.App.4th at p. 808, quoting *People v. Crooks* (1997) 55 Cal.App.4th 797, 807.)

Moreover, " '[p]unishment is not cruel or unusual merely because the Legislature may have chosen to permit a lesser punishment for another crime.  Leniency as to one charge does not transform a reasonable punishment into one that is cruel or unusual.' " (*Baker, supra*, 20 Cal.App.5th at p. 727.)  As noted, the trial court sentenced Manzo Gil under the One Strike law based on the jury's finding he perpetrated lewd acts against multiple victims (§ 667.61, subd. (e)(4)).  "[T]he punishment under the One Strike law 'is precisely tailored to fit crimes bearing certain clearly defined characteristics.' " (*Reyes, supra*, 246 Cal.App.4th at p. 89.)  For that reason, courts have rejected claims, similar to those presented here, that indeterminate life sentences imposed under the One Strike law constitute cruel or unusual punishment.  (*Ibid.*; accord *Baker,* at p. 730 ["A comparison of the mandatory 15-year-to-life sentence under section 288.7, subdivision (b) to the punishments for similar and more serious sex offenses in California does not suggest this is that 'rarest of cases' in which 'the length of a sentence mandated by the Legislature is unconstitutionally excessive' "].)  In view of this authority, as well as the substantial deference we owe to the Legislature in determining the punishments for crimes, we conclude the indeterminate sentence imposed in this case is not cruel or unusual punishment based on a comparison to the punishments for other crimes in California.

The third technique to assess proportionately requires " 'a comparison of the challenged penalty with the punishments prescribed for the *same offense* in *other jurisdictions* having an identical or similar constitutional provision.' [Citation.]  'Here the assumption is that the vast majority of those jurisdictions will have prescribed punishments for this offense that are within the constitutional limit of severity; and if the challenged penalty is found to exceed the punishments decreed for the offense in a significant

49

number of those jurisdictions, the disparity is a further measure of its excessiveness.' " (*Christensen, supra*, 229 Cal.App.4th at p. 808.) Even if " 'California's punishment scheme is among the most extreme,' " that fact alone does not necessarily " 'compel the conclusion that it is unconstitutionally cruel or unusual. This state constitutional consideration does not require California to march in lockstep with other states in fashioning a penal code. It does not require "conforming our Penal Code to the 'majority rule' or the least common denominator of penalties nationwide." ' " (*People v. Haller* (2009) 174 Cal.App.4th 1080, 1094.)

In his interjurisdictional argument, Manzo Gil cites nine other states and claims lewd kissing of a minor does not appear to be criminalized in three of them (Arizona, Nebraska, and Utah), it is punishable by a maximum life sentence in two of them (Kansas and Nevada), and it carries a term of years ranging from 75 months to 15 years in the remaining states (Oregon, Florida, Mississippi, and South Carolina). However, as Manzo Gil acknowledges in his reply brief, the jurisdictions in which the crime is clearly punishable do not include "any enhancement or alternative sentencing scheme based on the number of victims." Thus, "[w]ere we comparing similar statutes, we would compare the sister state statutes to Penal Code section 288, subdivision (a), establishing a punishment of three, six, or eight years. Defendant's citations simply do not show that the punishment inflicted pursuant to Penal Code section 667.61, subdivision (b) is excessive in comparison with punishments imposed for the same offense in different jurisdictions." (*Christensen, supra*, 229 Cal.App.4th at p. 809.)

In any event, as Manzo Gil admits, two of the other nine states he discusses (Kansas and Nevada) apparently affix the same maximum punishment as California for the lewd behavior at issue here—even *without* a

50

finding the offender committed lewd acts against multiple victims. (Kan. Stat. Ann. §§ 21-5506, subd. (b)(3), 21-6627, subd. (a)(1)(C); Nev. Rev. Stats. Ann. § 201.230, subds. (1)(a), (2).) "[T]he fact, acknowledged by defendant, that some other jurisdictions allow for the same or even harsher punishment ... indicates that in the abstract, the One Strike term imposed here is not irrational or obviously excessive punishment." (*People v. Alvarado* (2001) 87 Cal.App.4th 178, 200.) For this additional reason, Manzo Gil has not proven, through his limited survey of nine other states, that his punishment "exceed[s] the punishments decreed for the offense in *a significant number*" of jurisdictions. (*Christensen, supra*, 229 Cal.App.4th at p. 808, italics added; see *People v. Ruiz* (1996) 44 Cal.App.4th 1653, 1665 ["It is appellant's burden to establish the disparity of punishments in this and other jurisdictions."].)

### 2. *The Sentence Does Not Violate the Federal Constitutional Prohibition Against Cruel and Unusual Punishment*

Manzo Gil also contends his indeterminate sentence violates the ban on cruel and unusual punishment set forth in the Eighth Amendment to the federal constitution. We reject this argument as well.

The Eighth Amendment embodies "the 'precept of justice that punishment for crime should be graduated and proportioned to [the] offense.' " (*Graham v. Florida* (2010) 560 U.S. 48, 59.) However, this "proportionality principle is *narrow* in the context of noncapital sentences for adult offenders. [Citations.] 'It " 'does not require strict proportionality between crime and sentence,' " but prohibits " 'extreme sentences that are "grossly disproportionate" to the crime.' " ' " (*People v. Brewer* (2021) 65 Cal.App.5th 199, 212–213.) When assessing proportionality, " '[a] court must begin by comparing the gravity of the offense and the severity of the sentence. [Citation.] "[I]n the rare case in which [this] threshold comparison ... leads to an inference of gross disproportionality" the court should then

51

compare the defendant's sentence with the sentences received by other offenders in the same jurisdiction and with the sentences imposed for the same crime in other jurisdictions.' " (*People v. Blackwell* (2016) 3 Cal.App.5th 166, 202.) " '[O]utside the context of capital punishment, successful challenges to the proportionality of particular sentences have been exceedingly rare.' " (*Ewing v. California* (2003) 538 U.S. 11, 22.)

Our rejection of Manzo Gil's claim that his sentence violates our state's prohibition on cruel or unusual punishment applies equally to his analogous argument that the sentence contravenes the Eighth Amendment. Thus, for the reasons previously discussed, we conclude Manzo Gil's sentence does not violate the Eighth Amendment's ban on cruel and unusual punishment.

E. *The Trial Court Did Not Err By Failing to Seek an Extended Judicial Appointment for Sentencing or by Failing to Prepare for Sentencing*

Manzo Gil contends the trial court committed two interrelated errors related to sentencing. First, he claims the trial judge erred by failing to seek an extended temporary judicial assignment to ensure she could personally sentence him. Second, he argues the sentencing judge—who stepped into the shoes of the trial judge—did not adequately prepare for sentencing. These arguments are forfeited and without merit.

1. *Additional Background*

Judge Candace Beason presided over Manzo Gil's trial in May 2017. According to the parties, she was a retired judge temporarily appointed to the court under the Judicial Council's Temporary Assigned Judges Program (TAJP). Under the TAJP, the Chief Justice of the Supreme Court "issues temporary judicial assignment orders to active or retired judges and justices

52

to cover vacancies, illnesses, disqualifications, and calendar congestion in the courts" for one-month or case-specific assignments.[9]

After the jury returned its sanity verdicts on May 22, 2017, Judge Beason set sentencing for June 23, 2017. The defense requested an earlier sentencing, if possible, given that Judge Beason's temporary judicial assignment would soon expire on June 2. The court sensibly declined the request because the probation department could not prepare a post-conviction probation report and perform a Static-99 sex offender risk assessment on Manzo Gil prior to June 2. However, it set an expedited briefing schedule and hearing before the expiration of Judge Beason's assignment so she could consider Manzo Gil's claim that imposition of a 30-years-to-life sentence would be cruel and unusual punishment.[10] At that hearing, Judge Beason rejected Manzo Gil's cruel and unusual punishment claim and denied his motion to strike the jury's finding that he committed lewd acts against multiple victims.

Thereafter, the court granted numerous defense requests to postpone sentencing and, after defense counsel declared a doubt as to Manzo Gil's competence, the court suspended criminal proceedings until he regained his competence. As a result of these and other post-verdict developments, Manzo Gil was not sentenced until July 29, 2022, more than five years after the trial and the expiration of Judge Beason's temporary judicial assignment.

---

[9]    Manzo Gil's unopposed request for judicial notice of the TAJP Fact Sheet is granted. (Evid. Code, § 452, subd. (h).)

[10]    Defense counsel represented to the court that a cruel and unusual punishment argument was "basically the only argument [that would] be made at [the] sentencing hearing, given the convictions ...."

Judge Sean P. Crandell served as the sentencing judge. At sentencing, John Does 2 and 3 gave brief statements that Manzo Gil did not commit the crimes for which he was convicted. The court expressed appreciation for the victims' comments and then stated, "It is difficult for me to process those statements in light of the fact that I wasn't the judge that presided over the jury trial. That judge was a retired visiting judge who is no longer working in this county. And so I've been asked to do the sentencing. And I have read and reviewed the probation officer's recommendation. And I am familiar with the procedural history of the case. And so while I am faced with individuals here in court telling me that these crimes did not happen … this did go to a jury trial. There were 12 jurors that listened to the evidence that was presented by the People, and they found beyond a reasonable doubt that the two charges and allegations that were alleged were found to be guilty and true." Thereafter, the court followed the recommendation of the probation department and imposed an indeterminate sentence of 30 years to life.

2. *The Trial Judge Did Not Err by Failing to Request an Extension of her Temporary Judicial Assignment or a Reassignment*

On appeal, Manzo Gil claims the court erred insofar as Judge Beason did not request an extension of her temporary judicial assignment or a reassignment so that she, the trial judge, could sentence him.

Preliminary, Manzo Gil forfeited his claim of error because he did not ask Judge Beason to seek an extension of her temporary judicial assignment or a reassignment to the court to ensure she could sentence him. (See *In re Sheena K.* (2007) 40 Cal.4th 875, 881 ["In general, the forfeiture rule applies in the context of sentencing as in other areas of criminal law."]; *People v. Cardenas* (2020) 53 Cal.App.5th 102, 123–127 [defendant forfeited claim he was denied his right to be sentenced by same judge who accepted his plea].)

Manzo Gil's argument also fails on the merits. "Because of the significance of the trial record and the court's observations at trial, the usual procedure is for the person who served as the trial judge to preside at the sentencing hearing." (*Peracchi v. Superior Court* (2003) 30 Cal.4th 1245, 1254; see *People v. Cole* (1960) 177 Cal.App.2d 458, 460 ["it is normally the better procedure for the judge who tried the case and is presumably familiar with the course of the trial and the demeanor of the witnesses to act on the matter of probation and sentence"].) While this may be the usual and preferred practice, it has long been recognized that a defendant who has been convicted after a trial has no right to be sentenced by the same judge who sat through the trial. (*People v. Downer* (1962) 57 Cal.2d 800, 816 ["It is settled that it is not error for a judge other than the one who tried a criminal case to pronounce judgment and sentence."]; see also *People v. Jacobs* (2007) 156 Cal.App.4th 728, 733 (*Jacobs*) ["Defendant's first argument is that he had a right to be sentenced by the trial judge. Defendant is wrong."]; *Cole*, at p. 460 ["there is no error in another judge of the court performing [the sentencing] function"].) Thus, Manzo Gil had no right to be sentenced by Judge Beason.

Manzo Gil's argument likewise fails to the extent he claims Judge Beason should have sought an extension of her judicial assignment, or a reassignment to the court, to sentence him. Quite obviously, Judge Beason became unavailable to sentence him the moment her judicial appointment terminated and she re-entered retirement. Manzo Gil has made no showing that she had the capacity to obtain an extended judicial appointment or reappointment beyond that date. For that reason alone, his argument fails.

But even if Manzo Gil could overcome this hurdle, we would find no error. At base, Manzo Gil's argument assumes the law required Judge Beason to upend her personal and professional life—foregoing her re-entry

55

into retirement and prolonging her temporary employment—simply for the purpose of sentencing him, despite the fact that he had no legal right to be sentenced by his trial judge. The law imposes no such obligation on our state's judicial officers and it strains credulity that anyone would reasonably expect our judicial officers to take such extraordinary measures.[11]

### 3. *The Sentencing Judge Did Not Err by Failing to Familiarize Himself with the Material Facts of the Case*

Relatedly, Manzo Gil asserts the trial court abused its sentencing discretion because Judge Crandell was not adequately prepared to sentence him. According to Manzo Gil, Judge Crandell was insufficiently prepared because he relied exclusively on the probation report and did not review all of the trial evidence before sentencing him. We discern no abuse of discretion.

As a preliminary matter, Manzo Gil forfeited his claim of error. In the trial court proceedings, Manzo Gil did not request that the court review all of the trial evidence, object to court's readiness, or request a continuance of the sentencing hearing to ensure the court had sufficient time to prepare for sentencing. Nor did Manzo Gil object on grounds that the court gave

---

[11] In support of his claim of error, Manzo Gil relies on *Jacobs, supra*, 156 Cal.App.4th 728. *Jacobs* is readily distinguishable. There, the parties asked the trial court to continue the defendant's sentencing until the trial judge was available, two days later. (*Id.* at pp. 731–733.) The court denied the request, citing "jail overcrowding" as the reason for its denial. (*Id.* at pp. 732–733.) The Court of Appeal reversed. (*Id.* at pp. 740–741.) In so doing, it discussed the judiciary's preferred practice of the trial judge sentencing the defendant, and observed that the trial judge was "reasonably available" for sentencing a mere two days later. (*Id.* at p. 740.) That is a far cry from the present case, where the trial judge was unavailable due to the expiration of her temporary assignment to the court. Further, the parties in *Jacobs* merely sought to continue sentencing by two days, whereas Manzo Gil seeks far more radical relief—in effect, he seeks to compel a judicial officer to refrain from re-entering her retirement to sentence him. Nothing in *Jacobs*, or any other case law of which we are aware, warrants such relief.

inadequate consideration to the material facts of the case. Because Manzo Gil did not make any of these requests or objections, he cannot now claim that the court was insufficiently prepared to exercise its sentencing discretion. (See *People v. Scott* (1994) 9 Cal.4th 331, 353 (*Scott*) [the forfeiture rule applies "to claims involving the trial court's failure to properly make or articulate its discretionary sentencing choices"].)[12]

Manzo Gil's argument fails on the merits as well. He argues the court was unfamiliar with the material facts in evidence due to the court's exclusive reliance on the probation report. However, he does not identify any material facts that were omitted from the probation report. He claims the probation report was "not accurate" and "misleading" because it included allegations pertaining to count 1 (sexual penetration of John Doe 1), which

---

[12] The authorities relied on by Manzo Gil do not compel us to excuse his forfeiture. In *People v. Strunk* (1995) 31 Cal.App.4th 265, the sentencing judge—who did not oversee trial—reviewed a probation report that omitted several mitigating circumstances and then imposed the upper term. Although the defendant did not object, our court nonetheless addressed his claim that the sentencing judge had erred by failing to consider all of the mitigating factors contained in the record. (*Id.* at pp. 274–275.) Importantly, however, we reached the merits of this claim because the Supreme Court had issued its "new sentencing waiver rule" in *Scott, supra,* 9 Cal.4th 331, just days earlier, and that rule "only ha[d] prospective application." (*Strunk,* at p. 274, fn. 11.) By contrast, in the present case, the decades-old forfeiture (or waiver) rule discussed in *Scott* was well-established at the time of sentencing.

*People v. Panozo* (2021) 59 Cal.App.5th 825 does not support Manzo Gil's argument against forfeiture either. There, our court considered a claim that the trial court violated its statutory duty to consider the defendant's service-related posttraumatic stress disorder as a mitigating factor in evaluating whether to grant probation, despite the fact the defendant did not object in the trial court. We did so due to the type of claim the defendant sought to raise on appeal—i.e., his claim that the court misapprehended its statutory obligations. (*Id.* at p. 840.) Manzo Gil directs us to no analogous statutory obligation that the trial court failed to fulfill in the present case.

resulted in a mistrial. But we see nothing misleading or erroneous about the probation report's description of the allegations. The probation report referenced these allegations while accurately relaying the statements the victims made during their RCAT interviews; it did not suggest Manzo Gil in fact perpetrated acts of sexual penetration or that he was convicted for them.

Manzo Gil also faults the probation report for purportedly suggesting that he "readily and clearly admitted" to perpetrating lewd acts on his boys during the custodial interrogation, when in fact his admissions were coerced and involuntary. However, as we discussed earlier in our opinion, Manzo Gil's admissions were uncoerced and voluntary. Thus, the probation report did not provide an inaccurate description of Manzo Gil's admissions or withhold evidence necessary for the trial court to exercise its sentencing discretion in an informed manner.

Because Manzo Gil has not identified any statutory obligation requiring the trial court to review all of the trial evidence before sentencing, and he does not convincingly articulate any material errors or omissions in the probation report, we cannot conclude that the trial court abused its discretion in its preparation for sentencing.

F. *Manzo Gil is Entitled to 2,872 Actual Custody Credits and 430 Conduct Credits for a Total of 3,302 Presentence Credits*

During sentencing, the trial court awarded 2,426 actual custody credits and 363 presentence conduct credits to Manzo Gil. On appeal, he contends the court miscalculated both the actual custody credits and the conduct credits to which he was entitled. We agree.

" 'A defendant is entitled to actual custody credit for "all days in custody' in county jail and residential treatment facilities, including partial days.' [Citation.] 'Calculation of custody credit begins on the day of arrest and continues through the day of sentencing.' " (*People v. Valdes* (2020) 53

Cal.App.5th 953, 955.) Here, Manzo Gil was arrested on September 18, 2014, he was sentenced on July 29, 2022, and he remained in custody (either in jail or hospital) continually throughout this period of time. Therefore, he was entitled to 2,872 actual custody credits.

"In addition to actual credit, which accumulates from time spent in custody, detainees in local institutions are usually able to earn credit against their eventual sentence for good behavior and work performed. These ' "[c]onduct credit[s]" ' are authorized by section 4019. [Citation.] But their ability to earn presentence conduct credits is limited if they are convicted of certain offenses. [¶] Section 2933.1 restricts presentence conduct credits to no more than 15 percent of the overall time spent in local custody for defendants convicted of a violent felony" offense listed section 667.5, subdivision (c). (*People v. Brown* (2020) 52 Cal.App.5th 899, 902–903.) Manzo Gil's lewd act convictions are violent felony convictions subject to this 15 percent limitation. (§ 667.5, subd. (c)(6), 2933.1, subds. (a), (c).) Therefore, he was entitled to 430 presentence conduct credits (15 percent of 2,872 days).

IV

DISPOSITION

The judgment is modified to award a total of 2,872 custody credits and 430 conduct credits. As modified, the judgment is affirmed. The trial court is directed to prepare an amended abstract of judgment in accordance with this disposition and deliver it to the Department of Corrections and Rehabilitation.

McCONNELL, P. J.

WE CONCUR:

HUFFMAN, J.

BUCHANAN, J.